082326 in regard to the marriage of Stacey Streur and John Streur-June. If both sides, if just the attorneys are going to argue, you can approach the podium. Identify yourselves and tell us who you represent. Good morning, Your Honors. Jason Adas and Jennifer Cantrell on behalf of John Streur, the Appley Cross Appellant. And for Mr. Streur, I'm sorry. Yes, that's okay. David Grund and Melissa Grund on behalf of Stacey Streur, the Appellant, and also the Appley in the Cross Appeal. Very good. Special request by me. If you keep your voices up, I appreciate it. Thank you. Have you discussed how you want to handle the arguments, parties, with the Cross Appeal? Judge, we're able to do anything that you'd like us to do. If we can, we normally give 15 minutes. We give each side 20 minutes. Just handle it like normal. So you go first, Mr. Grund, and then counsel, and then Mr. Grund finishing up. We won't need to hear a reply. Would that be okay? Okay. So you want, if I go first as the Appellant, do you want me to argue the Cross Appeal as well? Yes. Okay. I shall do that. Thank you, Your Honor. Anytime you're ready, Mr. Grund. Good morning. And may it please the Court. I'd like to start off with a little policy statement concerning the public policy in place, concerning the issue of child support. As the Court is aware, it is the public policy of the State of Illinois to ensure the welfare of children. And oftentimes, if not most of the time, courts sit as parents' patria on behalf of children. And I think the law is well settled in this area that child support may never be waived by the parties or negotiated absent the approval of the court. In fact, we have certain guidelines in place today that's been promulgated by our legislature, which set forth the amount of support to be paid. And if there's a deviation to those guidelines, the law requires that judges give an explanation as to the reasons why there's a deviation from the guidelines, whether it's above or below the guidelines. In this particular case, we have the issue of the retroactivity of child support. We have an agreement of the parties that was adopted by the court concerning this very issue. The agreement, in effect, provided very clearly that five years following the entry of the judgment, the unallocated support and maintenance would terminate on March 1, 2005. And the subject, the issue, would be submitted to the court for determination of child support. In effect, the White House... If the parties could not agree, and they could not agree. If the parties could not agree. So the question then that begs the answer is, what is the meaning of... What is the status of that child support that terminated... Well, I shouldn't say terminated. I should say that ended in its present form, in the form that existed then, as of March 1, 2005. Was it a reservation of child support? Was it then to be a child support that was to be established de novo by the courts? Or was this a modification of child support? And I think that the distinction really here is a distinction without a difference. Because given the basis of our public policy and the guiding principles, we know that child support can never be extinguished. The obligation for child support can never be extinguished. Absent certain statutory factors. Emancipation of the child, the child reaching age 18. But none of these factors created a situation where the child support was terminated in any way on March 1, 2005. So, if in fact this was a modification of child support, then the law requires that before it can become retroactive, and this is the issue in this case, may the child support be retroactive to a point in time absent notice and absent the filing of some pleading concerning it. In this particular case, we argue, yes, it can. We argue that, in effect, the agreement of the parties was a self-executing agreement, which provided that child support would continue, and there is these provisions, absent any agreement, and child support would continue, but the amount would be set by the court absent the party's agreement as to amount only. There was never any agreement by the parents that one could, if that agreement could be structured so that it doesn't violate public policy, that the child support would continue in the future after that unallocated maintenance in child support would terminate. So, our view is that, number one, this was a custody determination de novo. Number two, that it was a reservation of custody, of, sorry, of support. And, therefore, the modification provision, which required notice, is inapplicable. However... Well, they filed their own petition, so they're not going to succeed on the notice requirement where they have their own petition pending. Their essential argument, really, I think, goes to the 1401 petition, that you try to job the system by filing a case, not in divorce court, where the case has been pending for years and years, but in chancery court. Right? Correct. That's their real argument, I think, from having read it. Okay. If you'd like, Justice Quinn, if you'd like me to turn my attention to 1401... It's up to you. Well, it's, I don't want to repeat anything that's been argued before, Justice Quinn. No, go ahead. You're here for argument. We said argument, because it's a significant case. It's interesting. The retroactivity aspect of it is very interesting. What day should it go back retroactive to? The trial court found the date 2007, and you're arguing the date which was put forth in the divorce decree of early 2005. Let me see if I can jump to the 21401 without causing any real injury, if I may, to the argument concerning child support. And I believe that this issue before the court is probably the most important issue rather than the 21401 petition. I think the other issues are rather simple. I think they're rather apparent from the arguments that have been made in the brief. I think there's this disconnect in our decisions concerning whether or not one needs a pleading to be filed before retroactivity can be made to the point in time where the child support obligation could be either modified or extended or renewed. And I think that it's clear from the case law that we've submitted that if one had, if an obligor, if a child support obligor has notice that the obligation is going to continue and that there will be an obligation that he's liable for or she is liable for child support, that is sufficient. And retroactivity should be permitted to the date of notice. And I think our cases support that. Although the facts may vary in certain circumstances, I believe that's clear and that's really the mandate that needs to be established clearly for the sake of children whose support is really their right and not the right of the litigants. Having said that, I'm going to jump to the 214.01 petition. We've got a situation where the dismissal, the 2619 dismissal of the 214.01 petition was predicated on two things. One, a sort of a quasi res judicata argument that a petition for rule that was filed by Stacy sometime prior to the filing of the 214.01 petition, actually two years before, more than two years before the filing of the 214.01 petition, somehow it did two things. One, it created a situation that set the, that stopped the tolling of the 214.01 two-year statute of limitations. The other argument that was raised is that the 214.01 was already an adjudication of the merits of the 214.01 petition. I don't read it that way. I don't read that their argument really is that there was a res judicata effect based on the withdrawal by Mrs. Strauer of her earlier petition for sanctions. I read it more or less as the blue brief would suggest that what the trial court was doing was saying when two years earlier when Mrs. Strauer filed a complaint or the petition for rule of show cause, she listed all the problems that she had and then she withdrew that and then years later brought up the same argument in a 214.01 petition. And so not the question that is not res judicata applies, but how does, what new information was supplied, what information was deprived of Mrs. Strauer when she listed all this information two years prior, actually more than two years prior to filing the 214.01? Substantial differences, and if I may address them. Number one, the petition for rule was an enforcement proceeding. She sought to enforce the true payment of support and maintenance, which the parties agreed to. She sought to enforce the provisions in the settlement agreement which mandated that husband provide to her all of the financial documents necessary to do that computation. He hadn't done that. Yes, that's true. And then she withdrew that petition. That's correct. She withdrew that petition and at one point she withdrew it after it was dismissed on a motion, a 2615 motion, and then refiled. And then the husband filed another motion and that was before Judge Donegan. That was an enforcement petition. The 214.01 petition, on the other hand, was a petition that was based on fraud, was based on accounting, seeking certain relief other than enforcement of an existing court order. In terms of facts, the facts were substantially different. She claimed that it was, in the 214.01 petition, that it was the husband's intent never to honor the agreement by providing her the appropriate maintenance and child support. She based it on her belief, right? No. Was that the phraseology in the 214.01 petition, based on petitioner's belief? Am I mistaken? No, she based it on the actual facts that occurred, the intervening facts that occurred from 2000 when the judgment was entered to 2006, I believe, when she filed the 214.01 petition. She had constantly sought to enforce her right to receive all that information. She subsequently discovered in 2005, Your Honor, that in fact, and this is the other difference that occurred, that we pled in the 214.01 petition. The 214.01 petition also alleged that he failed to disclose a 401k plan, a retirement plan, that husband acquired a 401k plan. As a general partner of this firm, he acquired a company worth, I believe, $3 billion, and never disposed his true interest in that. But all that was eventually agreed, was it not, I suggest, when it was agreed by the parties that the children should receive $17,000 in child support. So all these horrendous crimes that the dad theoretically was, if you say, really a billionaire or a multi-multi-millionaire. You agreed that the children are deserving not of 30% of that, which under the initial divorce would seem to be true, but rather $17,000. The children received $17,000 in child support somewhat later in time from Judge Brewer. And that was predicated on the children's needs and the lifestyle they would have enjoyed had the divorce not taken place, and the financial circumstances of the father, which were quite well. However, the original unallocated maintenance and child support was a bit more than child support. It was, in fact, a payment for the waiver of a maintenance five years later. It was, in fact, for the maintenance of the spouse, which had a concomitant child support attached to it. And so the wife gave up all of that property, with the exception of a residence and some very small retirement, for $100,000. It was for the husband's business and for her husband's retirement plan. And for the consideration that during that five-year period, the husband would pay that unallocated maintenance and child support in a fashion that she expected would exceed the, I forgot what it was now, $15,000 or whatever it was. The first $100,000, nothing for the second $100,000, 30% above $200,000. And so they negotiated this complex contract for that very reason. Had someone simply said, look, you're entitled to $100,000 or $15,000 a month or whatever it is for the next five years, and that's it, I wasn't there at the time. I filed a 214-01 petition when I, frankly, saw that she wasn't moving the case forward. She would not have entered into that agreement. I'm certain of that, because one can reasonably construe that one doesn't jump from making $200,000 or $300,000 a year in five years to millions and millions of dollars thereafter. And being able to buy companies and improving your holdings to $17 billion thereafter. So to answer the question that you raised, Justice Quinn, and it's a very good question, what was the difference in the 214-01 to the rule of show cause? Many differences. The cause of action was different. The causes of action were different. One was for enforcement, the other was for accounting for conspiracy for fraud, which is the basis of a 214-01 petition. We allege facts that arose as late as 2005 that we just first learned of. So that two-year statute of limitation really is a red herring, since we've alleged, and the law requires that courts consider all well-pledged facts as true. And be taken by the court in the light most favorable to the pleader in this particular instance. And so if that were so, I submit that the court could not at that point dismiss it in a 2619 fashion with prejudice. Because the only prejudice that would occur would be if, in fact, it was adjudicated previously. And with respect to that res judicata argument, Your Honor, I believe that the argument that was raised, and it's never been challenged. We raised the argument that the court, in its dicta and in its findings, assumed that it was adjudicated previously. And that hasn't been challenged by Mr. Struer at all. I believe that they've conceded by not defending our position here that we've raised. Yeah, res judicata does not apply. No question. It does not apply. Well, if it doesn't apply, then the only thing that one can say is that the rule to show cause argument, as you just suggested, Justice Quinn, are the same facts that were alleged in 2000 prior to 2006. You don't need the same facts. You need similar facts. But those facts, if put in a different light, such as that he never intended to comply with his representation in the divorce decree. And that's your argument, that so they had her earlier attorney, rather than filing a rule to show cause, had filed it as a 1401 trying to attack the judgment itself. You should be able to do that five years later because it's federal lawyering. Would that be right? No, not necessarily, Your Honor. And what I'm suggesting is not only were there new facts fled, which they were, and that's clear. But the cause of action to support the 214-01 petition, namely fraud, wasn't discovered until she exercised all reasonable efforts to obtain the information she needed. The information that the husband, the financial information, that the husband promised he would deliver. And we argue that he never intended to do that. This was a ruse to lull her into a false sense of security in entering into this mental settlement agreement in the first place. And so that's a distinct difference. The light in which something is represented, and when that crystallization comes about as a result of a five-year effort to get the information that she was supposed to get, had she gotten this information earlier, there would be no doubt that she would have discovered exactly what she discovered in 2005. Inadvertently, when this merger took place between the $3 billion company and husband's $17 billion company in 2005. And so it was only after that that additional information was obtained to the point where the fraud action actually germinated and flowers began to grow. And so that's our argument. Thank you. Mr. Ades. Judge, to pick up on the argument with regard to the 214-01 petition, I think that you asked the question pointedly, what allegations are different in the 214-01 petition than the earlier petition? And the answer is none. And you really keyed in on it when you said, wasn't this an effort to job the system? They filed three separate motions attacking the enforcement and the compliance with the judgment unsuccessfully. They were all stricken for failure to state a claim because of affirmative matters that negated the claim. There's a crucial fact here that I think is dispositive of the entire issue. That is that the marital settlement agreement, paragraph 8 of the marital settlement agreement, defined the documents that Mr. Struer was required to produce in connection with the unallocated maintenance and support payments that he was required to make. At the trial level, that paragraph was left out of the presentation to the court. It limited to W-2 statements, K-1 statements, pay stubs and tax returns with certain information unrelated to earned income redacted. Mr. Struer complied with that provision, and it's a matter of the record. If you look in the record at the order that was entered on June 9th of 2005, that order reflects the fact that Mr. Struer not only produced these documents himself voluntarily, but also pursuant to a subpoena that was issued to his employer, all of that information was provided to Mr. Struer. And when? Subsequent to the issuance of the subpoena. Right. So he didn't do it voluntarily, right? I've been subpoenaed many, many times as a prosecutor. I don't recall ever willingly, you know, well, here, give me all your personnel file, Mr. Quinn. Okay, no. And they come with a court order, and I don't say voluntarily, he gave them anything. No, no, actually, though, what happened in this case was that he did produce it voluntarily, and because of the conspiracy theories that had already been germinating, they said, we would like to see it directly from the employer and not from you, Mr. Struer. So on an annual basis, when he would send in his $8,000 a month, which was the most common thing, which comes to mean under the agreement, roughly he was asserting then, under your agreement found at page 9 of the white brief, he has to pay the 100% of his first $100,000, which is a little over $8,000 a month. And so when he's paying her $8,000 a month, which is, again, I think the most common amount of money he was paying her, he was asserting then, he didn't make a nickel over $200,000. Because if he did, he'd have to pay $8,000 a month. If he didn't, he'd have to pay her more. And you're saying during those periods of time, when he was sending $8,000 a month, he was also sending over his pay stubs and his W-2 statements. Is that what you're saying? I'm not saying that. But what I am saying... Well, then how does that comply with what the agreement was, the initial divorce agreement? There may not have been compliance with the disclosure during that period. May not? How long you been his lawyer? No, no, no, but that's... With respect, and I'm not... I think that the operative fact, however, though, is prior to the filing of the 214-01 petition, and I don't profess to know exactly what documents during the period of time prior to the litigation starting, what documents were produced on a going forward basis. What I can tell you, Your Honor, in certainty, is that prior to the 214-01 petition being filed, all of the documents were not produced contemporaneously. If there was any damage to Mrs. Struer by not having received them during the years that she was getting unallocated maintenance, that is appropriately dealt with pursuant to a petition for rule to show cause or a motion to enforce the judgment, if she'd incurred any attorney's fees, for instance, in pursuing those documents. But once she had the documents, the tax records, the K-1s, she was able to ascertain and, in fact, confirm that he didn't owe her a single dollar, that he had paid her everything that she was owed during that period. And repeatedly, Mrs. Struer has failed to lay those, I think, dispositive facts out for the Court's consideration. That, I think, is the key, and there's no question... The key to the 14-01. Key to the 14-01. Key to the 14-01. There are deficiencies in the limitations on the 14-01. And clearly, the key allegations in the 14-01 are that she, that he allegedly failed to comply with the judgment by not producing the documents and by not paying the amounts that were due under the judgment. And it was clear that those facts were known to her greater than two years prior to the filing of the 14-01 petition and is time-barred, plain and simple. There is a menu of other reasons that it was necessary to dismiss the 14-01 petition, including lack of a statement of a meritorious claim. There are no cases that we were able to find that dealt with the conduct of a litigant after the entry of judgment that constituted fraud that attacked the validity of the judgment itself. That is, it wasn't a fact that was concealed to Mrs. Struer that would have kept her from entering into the judgment in the first instance. Rather, these were allegations of noncompliance. And we know why this petition came about. They filed petition after petition alleging noncompliance with the judgment, trying to make an enforcement complaint in the divorce court, and they were unsuccessful in doing it. And after being dismissed on three different occasions for failing to state a claim, they dismissed out their case, they ran to the Chancery Court to try to get a different view of the case to hear it. That's what happened here. That's the case in a nutshell. Can you address the retroactivity of the issue? I certainly can, Judge. And the retroactive child support issue is as simple as follows. Stacey filed a petition for unallocated support payments on June 2, 2004, prior to the expiration of her unallocated maintenance. She moved to voluntarily dismiss that petition on June 14, 2006. So she had fixed her right to seek retroactive support if she had elected to adjudicate her petition. The court had the right to look back if it was appropriate. But she voluntarily dismissed that petition. She later filed the new child support petition on May 18, 2007, and that was the petition that the court found it was hearing. It was the only petition that the court found it was hearing. And it was the only petition before the court regarding child support, and awarded retroactive to that date. The dispositive case on this issue, Your Honor, is in lay the marriage of Somanchik. And this was not a case that was cited by either party in their briefs, but one that... Have we sent that out to everybody? I did send it out to Mr. Grunt yesterday. I didn't get it. And I apologize, Your Honor, and I could provide you with a copy of it this morning. No, we have access to it. What is the citation? The citation is 733 Northeast 2nd, 811. When and where? It was a First District 2000 case. It's the latest case, later than any other of the cases cited within the brief regarding retroactive support. And it's absolutely dispositive on the issue. The facts in that case was the husband filed a motion to modify his support. He subsequently filed a motion to voluntarily dismiss that motion to modify. That motion for voluntary dismissal was granted. He subsequently tried to vacate that voluntary dismissal, which was denied, and then finally filed a supplemental motion to modify the support. But argued that the retroactivity should go back to the earlier motion that he had moved for voluntary dismissal on. That was denied. And said that pursuant to the plain language of 510A, that the voluntary dismissal acted as a final judgment on the earlier filed petition, and the court lacked the jurisdiction to award retroactive support any earlier than the supplemental motion. But what the dad was doing there was trying to prevent paying more money to the child. Would that be correct? And he's arguing that the earlier date, the court should look back at the earlier date where I'm trying to deprive my child of more child support. And therefore, look at that date. Would that be right? Well, first of all, on the facts of the case, there was no deprivation here at all. And Mr. Struhr was paying $6,000 a month in child support. I'm asking about the case you didn't supply to us. In that case, was that guy, was the dad trying to say, trial court, I'm going to pay $6,000 a month in child support. You should look back to when I first filed it, when I'm trying to lower my payment. He says, no, we shouldn't look forward, backward to lower your payment. There was a period of time he was making less money than he was at the time he filed the supplemental motion, and so the denial of the retroactivity. But that wasn't when you read the motion I didn't supply you. Let's go back to Sumatra. So in Sumatra, did that dad, was part of his initial divorce decree involve a date of where there was an agreement among the parties? That there would be the amount of child support would be determined on a date certain to it, in this case, 3-1-0-5? It did not. Did it involve a, go ahead. Well, it did not. And to your point, the marital settlement agreement in this case, which says, we agree with the court determinants, cannot be read to mean that the court automatically has the right that we're waiving the application of 510A. That says that retroactivity begins upon the filing and notice of a petition. That would mean that if the parties had reached their own agreement, think about the practical impact of the opposite conclusion. Child support, they could have been paid voluntarily for a period of years. Mrs. Struhr could have been satisfied with the amount of support that she paid. Years would go by and suddenly, for whatever reason, would say, you know what, I'm not happy with it. And I'm going to go back and I'm going to file a petition to set my child support and argue that because of this provision in our marital settlement agreement, the court needs to go back now retroactively and fathom whether or not the payments that I received and did not complain about were sufficient or insufficient. So I think, with respect, that a view that that provision reads out 510A. That is essentially a waiver of 510A. I don't recall seeing that in the briefs either, frankly. Was that argued in the briefs that 510A operates to take out what the agreement was? That 510A trumps the original divorce settlement agreement? I don't recall seeing that. Was it in there? The issue is, was it in the brief that 510A trumps the agreement, the original divorce decree agreement? If it wasn't said that plainly, I know that that's... It was never a self-executing agreement. That the parties were required to follow the mandates of 510A. And they did. Let me finish. Mrs. Schreuer filed a petition to set it in February. Your client filed a petition to set it, I think, in April of 05. In April 1st of 05. And never withdrew it. Now, he was allowed, given permission in 2007 to amend it, but she never filed. He never filed in 2007. Having granted his petition to amend his April of 05 petition to set this. How is it he's not on notice when it's both in the divorce decree and in his filings? His filings. Not just hers, but his. His request in April of 05, please judge, we're not agreeing. Please set an amount of child support. And then, 2011, argued in front of the appellate court, we can't believe you reset the amount of child support based on 05. Right? That's the argument. Is it not? Judge, it's not a function of notice. Okay. What is it a function of? Interestingly, if you recall the way that this played out, when Mrs. Schreuer dismissed out her own petition for child support, she then argued before the trial court that there was no jurisdiction for the court to hear anybody's motion, including Mr. Schreuer's motion. And she's completely wrong in it. Because they ran off to chancery. But wouldn't it be reasonable at that point for a litigant to then conclude that she's no longer seeking child support and not have to prosecute his case at that point? Well, you're going to find out, won't you, if that's rational. How is it rational after he has her, the agreement says child support will be determined beginning after March 1st. He files it, she files a motion one month prior, your client files a motion one month after, and he's claiming, oh, it's just not fair that it's going to be reset. But it's a function, she vacated her pursuit of that child support. And since it's a judge's system, the children should be deprived of this extra money. I understand that argument. I have a lot of sympathy with that argument. However, I don't know that the law has a lot of sympathy with that argument. Well, there's an assumption also that there would have been any retroactive support awarded based upon the amount of money that he was earning during that period. But putting that aside for a second, I don't know that you can have it both ways. I don't know, you know, 510A takes into consideration the public policy that we've been discussing this morning, the protection of children. And there is a countervailing interest for litigants to know when they are under an obligation to pay potentially retroactive child support so they can plan their own finances. And when somebody tries to job the system and they withdraw, they have a final judgment entered relative to a petition for child support that they were seeking. The law as it exists says you can't go back earlier than that. What was the final judgment entered as to child support in this case? What day was it entered? The order that set the child support was in 2008. And that was after hearing on the petition for child support on May 18, 2007. I don't know the exact dates. And the amount of money was then at $17,000? It was at $17,000, and there was a $60,000 lump sum payment that was due back. To point out that the $17,000 was on an expense affidavit where Mrs. Struhr's total expenses didn't even, were $16,000 and change, so there was no question that all of her own expenses were being paid by the child support in addition to the children's. So, I mean, this is the suggestion that somehow the children in this particular case are being, were cheated as a result. So the jobbing of the system resulted in a loss to the children. I respectfully don't accept that proposition. You don't need to accept it, do you? Do you want to argue about the attorney's fees? Yeah, I do. Thank you, Your Honor. Judge, the petition, our position on the fees is that it was an abuse of discretion to award Stacey Struhr any fees other than what she incurred in connection with the child support proceeding. Eight post-judgment petitions filed in this matter. Four of them were withdrawn or voluntarily dismissed by Mrs. Struhr. Three of them were dismissed by the court for failing to state a claim. And one was resolved by agreement, except for the retroactive support element of it, which was argued before the court orally. We know that there was form shopping involved here that we've discussed this afternoon in connection with the 214.01 petition. We know that there was a failure to disclose to the court the complete language of paragraph 8 of the marital settlement agreement. We know that there was a failure to advise the court of the documents that Mrs. Struhr received and when she received them. At the conclusion of the matter, Mrs. Struhr presented a $127,000 fee award representing all of the fees that she incurred in the matter and arguing that she had an inability to pay her own fees without undermining her financial stability and that Mr. Struhr should pay 100% of her fees. It was apparent from my reading of Judge Brewer's ruling that she felt that because she perceived that Mrs. Struhr could not afford to pay her own fees, that unless she found Mrs. Struhr's conduct to be sanctionable, she was bound to rule that 100% of the fees be paid by Mr. Struhr. And I submit to you that there was no reasonableness to the fees that were incurred in this matter and that she should have borne some responsibility for her fees, particularly in a post-judgment case. Years after the judgment was entered, and now we're talking about post-judgment litigation that's approaching the length of the marriage, with no marital estate with which to reapportion fees. And the precedent that the decision states is that if you are a non-moneyed spouse in a post-judgment setting with an ex-spouse that has money, you can litigate with impunity and you can lose all of your motions and be on the border of participating in sanctionable activity. And the worst that's going to happen to you is you won't have to pay for going through the process. Don't you think that some of this, the litigation, was going to occur, was acknowledged when the parties agreed that they'd go back to court to fight in March 1st of 2005 if they couldn't agree? And they both decided they're not going to agree. And that's precisely the reason why we submit to Your Honor that Mr. Struer should be responsible for $22,000 of the $127,000, which represents the fees incurred in connection with the child support. And we presented that. We had the time records. We presented that evidence to the trial court, that that was the portion of the fees attributable to the child support proceeding. And Mr. Struer is prepared to contribute 100 percent of those fees. He already advanced $15,000 during the course of the case and is suggesting that he pay another $7,000 so that Mrs. Struer paid no dollars in connection with the child support. Okay. Anything else? Nothing else. Thank you very much. Thank you, Mr. Aitken. Very briefly, Mr. Grunt. Thank you. Let me address the attorney fee issue. The argument, in my respect, that counsel just made has absolutely no validity in existing law. Section 508 is clear that the court has the discretion to award fees in post-decree litigation with respect to the enforcement. The statute has been changed, though, has it not? The way I read it, and I think the way they read it, is that the prospect of attorney's fees are no longer available in post-judgment. Do you read the statute that way? I understand you're not agreeing with it, but they bring up the new statute on the prospect of fees. The statute that's been changed just requires basically my interpretation, and I believe soon-to-be-established law, that the prospective attorney fees require a hearing versus a non-evidentiary hearing on prospective fees in pre-decree cases because the concept of marital assets being distributed during the pre-decree stage, not being another party's assets, but the marital estate is technically paying the funds for prospective fees out of the marital pot. In this particular instance, Your Honor, this was not a prospective fee. So in terms of the change in the law, it doesn't affect the existence of the law and the application that was made in accordance with the law and these fees. What we have to remember is clearly Section 508 permits such fees. They were done in accordance with Section 508. Winning or losing the particular case is not dispositive of whether or not attorney fees should be awarded. That would discourage the good-faith litigation being proffered to the courts and especially by economically disadvantaged spouses. So much said for that. I do want to disabuse my respected colleague of the notion that sending a subpoena for information in- Counsel, no need to hurry. You don't have any other kind of time to be calling. No, I did that. I'll take- I'm allowed to because I am given unlimited time. I have no- Answering a subpoena is not voluntary. It's not voluntary. I have no doubt, as I see, Judge, that you've done your homework and I respect the Court. Thank you for permitting me to argue. Thank you. Thank you for the fine briefs, great arguments. This matter will be taken under advisement.